IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CRISTIE MARIE PRASNIKAR,

        Plaintiff,

                                        3:13-CV-258-PK

                                        FINDINGS AND
v.                                        RECOMMENDATION


OUR SAVIOR'S LUTHERAN CHURCH OF
LAKE OSWEGO, OREGON, EVANGELICAL
LUTHERAN CHURCH OF AMERICA, RALPH
W. VEERKAMP, and OREGON SYNOD OF
THE EVANGELICAL LUTHERAN CHURCH
IN AMERICA,

        Defendants.
_____

PAPAK, Magistrate Judge:

      Plaintiff Cristie Marie Prasnikar filed this action against defendants Our Savior's

Lutheran Church of Lake Oswego, Oregon (the "Congregation"), the Evangelical Lutheran

Church of America ("ELCA" or the "national organization"), and Ralph W. Veerkamp on

Page 1 - FINDINGS AND RECOMMENDATION

February 14, 2013. Prasnikar amended her complaint effective September 16, 2013, adding as an additional defendant the Oregon Synod of the Evangelical Lutheran Church of America (the "Synod" or the "Oregon Synod"). By and through her amended complaint, Prasnikar alleges the vicarious liability of defendants the Congregation, ELCA, and the Synod for sexual battery of a child, the direct liability of Veerkamp for sexual battery of a child, and the direct liability of defendants the Congregation, ELCA, and the Synod for negligence in connection with retaining Veerkamp as a volunteer, accepting Veerkamp's volunteer services, supervising Veerkamp, and failing to prevent Veerkamp's sexual abuse of Prasnikar. Prasnikar seeks award of approximately $300,000 in economic damages, $6,000,000 in non-economic damages, and $10,000,000 in punitive damages. This court has jurisdiction over Prasnikar's action pursuant to 28 U.S.C. § 1332 based on the complete diversity of the parties' citizenship and the amount in controversy.

Now before the court are ELCA's and the Synod's motion (#45) for summary judgment, the Congregation's motion (#49) for partial summary judgment, and ELCA's and the Synod's oral motion of September 16, 2014, for stay of expert discovery pending disposition of their motion for summary judgment. I have considered the motions, all of the papers and pleadings on file, and oral argument on behalf of the parties. For the reasons set forth below, ELCA's and the Synod's motion (#45) for summary judgment should be granted in its entirety, the Congregation's motion (#49) should be granted as to Prasnikar's negligence claim and prayer for punitive damages and otherwise denied, and ELCA's and the Synod's oral motion for stay of expert discovery should be denied as moot.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party taking the position that a material fact either "cannot be or is genuinely disputed" must support that position either by citation to specific evidence of record "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," by showing that the evidence of record does not establish either the presence or absence of such a dispute, or by showing that an opposing party is unable to produce sufficient admissible evidence to establish the presence or absence of such a dispute. Fed. R. Civ. P. 56(c). The substantive law governing a claim or defense determines whether a fact is material. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).

Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied*, 116 S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

## MATERIAL FACTS

### I.    The Parties

Plaintiff Prasnikar is a resident and citizen of Arizona.  Prasnikar was born in 1978 and spent her childhood years in Lake Oswego, Oregon.

Defendant ELCA is a non-profit corporation organized under the laws of the State of Minnesota with its headquarters in Chicago, Illinois.  ELCA shares its name with a denomination of Lutheranism, and is the national organization within or under which synods and churches (congregations) of that eponymous denomination operate.

Defendant the Synod is a synod of ELCA and a non-profit corporation organized under the laws of the State of Washington with its headquarters in Portland, Oregon.  It encompasses nearly 120 Lutheran congregations located across thirteen different synodical geographic regions located within Oregon and Northern California.

Defendant the Congregation is a church or congregation of the Evangelical Lutheran Church of America denomination, organized within the synodical geographic region of the Oregon Synod referred to as the "Oregon Trail Cluster" and based in Lake Oswego, Oregon.

Defendant Veerkamp is a resident and citizen of California.  At all times material to Prasnikar's complaint, Veerkamp was a member of the Congregation, served as chairman of the Congregation's "Youth Committee," and served as a lay volunteer "small group leader" of the corporate defendants' youth program.  Prasnikar was a member of the youth group assigned to Veerkamp's direct leadership.

## II.    The Parties' Dispute

### A.    Material Background Information

The Evangelical Lutheran Church of America denomination is organized into three so-called expressions: the ELCA national organization, the synods or assemblies of congregations, of which the Oregon Synod defendant herein is one, and the individual congregations or churches that make up the synods, of which the Congregation defendant herein is one. The ELCA national organization operates according to a written constitution which, among other things, sets forth certain terms and conditions with which the synods and congregations must comply in order to remain within the national organization. The Congregation expressly concedes that it at all material times was subject to the "oversight, direction, control, and discipline" of ELCA and the Oregon Synod, although ELCA and the Synod dispute the extent of the oversight, direction, control, and discipline they were authorized to exert over the Congregation, in particular with regard to the Congregation's relationship with volunteer lay leaders such as Veerkamp.[1]

There is no dispute that each church of the denomination, including the Congregation, is required under the ELCA constitution to be run by an ordained pastor, and that every such pastor must be selected and hired from a "roster" of "approved" pastors maintained by ELCA. In addition, it is undisputed that ELCA maintains similar "rosters" of approved persons for some lay leadership positions within congregations. However, it is likewise undisputed that churches may select "non-rostered" lay leaders for positions within certain categories, including the leadership positions filled by Veerkamp. It is undisputed that Veerkamp was a "non-rostered" lay leader.

---

[1] I do not rely on the Congregation's concession that it is subject to the oversight and control of ELCA and the Synod in reaching my disposition of the parties' motions.

Page 5 - FINDINGS AND RECOMMENDATION

ELCA and the Synod take the position that they have no involvement whatsoever with any congregation's relationship with any non-rostered lay leader. Notwithstanding the foregoing, there appears to be no dispute that each congregation is required to adopt the national organization's model constitution, and that each congregation is required to adhere to a specific set of theological doctrines. It therefore appears undisputed that if a congregation were to hire a lay leader who promulgated a different theological doctrine to persons in his or her charge, ELCA and the Synod would treat such hiring as a violation of the ELCA constitution. Moreover, there appears to be no dispute that congregations are under the direct control of the synods in connection with all doctrinal and theological matters, that synods have the power to discipline congregations for deviations from the approved ECLA theology, and that synods have appellate authority over any member congregation's decision to discipline its own personnel.

It is undisputed that, under the ELCA constitution, "youth ministry" is a part of the "evangelical mission" of all three "expressions" of the denomination, that responsibility for fostering youth organizations is entrusted by ELCA to the synods, and that the Oregon Synod relies upon the congregations within its territory to fulfill the denomination's youth-ministry mission. In the 1980s and 1990s, the Congregation operated a youth ministry it referred to as the "Great Commission Subcommittee" or "GCS." The express purpose of GCS was to "share" ECLA theology with young persons, and there is evidence that Congregation leaders viewed the program as a vehicle both for theological education and for recruitment of youth into the denomination. Children involved in the GCS program were divided into "small groups" of approximately ten children each, and each such group was assigned to a "small group leader." Small group leader responsibilities included conducting bible-study meetings, modeling

Page 6 - FINDINGS AND RECOMMENDATION

"Christian leadership," mentoring children within the group and "presenting the Gospel" to them, conducting group activities, and providing personal attention to the needs of the children within the group.

In 1993, Veerkamp was elected to chairman of the Congregation's youth committee, at which time he also began serving as a GCS small group leader.

### B.     The Abuse Underlying Prasnikar's Claims

In 1993, during the autumn of Prasnikar's freshman year of high school when she was approximately fourteen years old, the Congregation assigned Prasnikar to Veerkamp's GCS small group. It is Prasnikar's position that at that time Veerkamp began a process of "grooming" her that culminated in sexual abuse, and that he did so initially for the purpose of furthering the interests of the Congregation, the Synod, and ELCA; defendants do not for present purposes dispute that position. Veerkamp's grooming of Prasnikar included paying special attention to her and telling her that he had a special bond with her, inviting her to his home and spending long periods of time alone with her, soliciting her opinion as to questions of theology and pedagogy, undertaking to provide her with Christian counseling, and cultivating the gratitude and loyalty of her parents. Beginning in autumn of 1994, when Prasnikar was approximately fifteen years old, he began kissing and fondling her; by spring of 1995 he progressed to acts of oral sex and digital penetration; and by 1996 he was having sexual intercourse with her and causing her to participate in acts of anal penetration. Veerkamp and Prasnikar engaged in sex acts as frequently as three times per week, in cars, in Prasnikar's home, in Veerkamp's home, and at GCS events. These acts continued for a period of years, until Prasnikar was approximately twenty years old.

There is evidence that other GCS small group leaders developed suspicions that

Page 7 - FINDINGS AND RECOMMENDATION

Veerkamp and Prasnikar were involved in a sexual relationship during this period, and that one such small group leader reported his suspicions to Congregation president Chuck McClung and Congregation youth minister Chris Lyons, but no investigation followed and no action was taken against Veerkamp in connection with that report; this evidence is, however, disputed by the Congregation. There is also evidence that some members of Prasnikar's family suspected or assumed that Prasnikar and Veerkamp were involved in some form of sexual relationship during the period the abuse was taking place.

## ANALYSIS

As noted above, Prasnikar alleges claims of sexual battery of a child (specifically, the direct liability of defendant Veerkamp and the vicarious liability of defendants the Congregation, ELCA, and the Synod for sexual battery of a child) and of negligence (specifically, the direct liability of defendants the Congregation, ELCA, and the Synod for negligence in connection with Veerkamp's volunteer services), and in connection with those claims seeks award of economic damages in the approximate amount of $300,000, non-economic damages in the approximate amount of $6,000,000, and punitive damages in the approximate amount of $10,000,000. Defendants ELCA and the Synod move for summary adjudication of both of Prasnikar's claims to the extent alleged against them and, in the alternative, to strike Prasnikar's prayer for punitive damages, whereas defendant the Congregation moves for summary adjudication only of Prasnikar's negligence claim against it, Prasnikar's prayer for non-economic damages to the extent that prayer exceeds the statutory cap set forth at Or. Rev. Stat. 31.170, and Prasnikar's prayer for punitive damages.

I. **Prasnikar's Negligence Claim (ELCA's and the Synod's Motion (#45) for Summary**

Page 8 - FINDINGS AND RECOMMENDATION

Judgment; the Congregation's Motion (#49) for Partial Summary Judgment)

Both sets of moving parties seek summary adjudication of Prasnikar's negligence claim. By and through her memoranda in opposition to the motions now before the court, Prasnikar expressly concedes that her negligence claim is time-barred in its entirety. I agree with all of the parties that Prasnikar's claim is time-barred under Or. Rev. Stat. 12.117. In light of Prasnikar's express concession, both motions for summary adjudication should be granted as to Prasnikar's negligence claim.

II.    Prasnikar's Claim of Sexual Battery of a Child (ELCA's and the Synod's Motion (#45) for Summary Judgment)

ELCA and the Synod move for summary adjudication of Prasnikar's sexual battery claim, not on its merits, but on the grounds that neither of those entities may properly be held vicariously liable on that claim. The Congregation does not seek summary adjudication of Prasnikar's sexual battery claim.

Prasnikar's pleading does not clearly indicate whether Prasnikar brings her sexual battery claim against the entity defendants on a theory of *respondeat superior* liability, a theory of general agency liability, or both. ELCA and the Synod offer arguments addressing both possible theories of their vicarious liability. Prasnikar appears to concede, by and through her opposition memorandum, that the doctrine of *respondeat superior* is inapplicable to her claim, but nevertheless offers arguments in opposition to ELCA's and the Synod's motion that can reasonably be construed as addressing matters that could support a theory of those defendants' *respondeat superior* liability. I therefore analyze ELCA's and the Synod's arguments addressing both possible vicarious liability theories, in turn. For the reasons that follow, I find that ELCA's

and the Synod's summary judgment motion should be granted as to Prasnikar's sexual battery

claim to the extent alleged against ELCA and the Synod.

### A.    Prasnikar's Claim of Sexual Battery of a Child Construed as Premised on a *Respondeat Superior* Theory of Vicarious Liability

According to Oregon law:

> Under the doctrine of *respondeat superior*, an employer is liable for an employee's torts when the employee acts within the scope of employment.  Negligence or other tortious conduct by the employer is not required.  . . .

> Three requirements must be met to conclude that an employee was acting within the scope of employment.  These requirements traditionally have been stated as: (1) whether the act occurred substantially within the time and space limits authorized by the employment; (2) whether the employee was motivated, at least partially, by a purpose to serve the employer; and (3) whether the act is of a kind which the employee was hired to perform.

*Chesterman v. Barmon*, 305 Or. 439, 442 (1988) (citations omitted).

The *Chesterman* court specified, however, that where there is a "'time-lag' between the act

allegedly producing the harm and the resulting harm," it is inappropriate to analyze the

applicability of the *respondeat superior* doctrine "as of the time that the injury occurred." *Id.* at

444.  Under that circumstance, the court ruled, "[t]he focus should be on the *act* on which

vicarious liability is based and not on when the act results in *injury*." *Id.* (emphasis original).

Applying that principle, the court found that an employer could be vicariously liable for its

employee's acts where the employee ingested a hallucinogenic drug allegedly for the purpose of

maintaining focus at work and then later, outside the workplace and outside the scope of his

employment – but still under the influence of the drug and, allegedly, in consequence of the

drug's effects – entered a woman's home and sexually assaulted her. *See id.* at 443-444.

Eleven years later, in a case involving sexual assault allegedly committed by an employee

Page 10 - FINDINGS AND RECOMMENDATION

of the Roman Catholic Archdiocese of Oregon, the Oregon Supreme Court had occasion to

clarify the *Chesterman* ruling. Noting that "an employee's intentional tort rarely, if ever, will

have been authorized expressly by the employer," the court in *Fearing v. Bucher*, 328 Or. 367

(1999), acknowledged that the employee's "sexual assaults . . . clearly were outside the scope of

his employment," but held that "the [vicarious liability] inquiry does not end there." *Fearing v.

Bucher*, 328 Or. 367, 374, 374 n. 4 (1999). Instead, the court held, "[t]he Archdiocese still could

be found vicariously liable, if acts that were within [the employee]'s scope of employment

*resulted in* the acts which led to injury to plaintiff." *Id.* (citation, internal quotation marks

omitted; emphasis supplied). That is, "where . . . the employer's vicarious liability arises out of

the employee's commission of an intentional tort, [the court] must consider whether . . .

allegations contained in the . . . complaint state ultimate facts sufficient to establish that acts that

were within [the employee]'s scope of employment resulted in the acts that caused injury to

plaintiff." *Id.*

      Here, ELCA and the Synod do not dispute for present purposes that the abuse Prasnikar

suffered at Veerkamp's hands resulted from the "grooming" conduct described above, or that

Veerkamp's "grooming" behavior was, at least initially, motivated by desire to fulfill his duties as

a volunteer lay leader and youth minister. Instead, ELCA and the Synod deny that Veerkamp can

properly be deemed their employee or servant for purposes of the *respondeat superior* analysis.

      Shortly after the *Fearing* opinion issued, the Oregon Supreme Court affirmed in *Lourim

v. Swensen*, 328 Or. 380 (1999), a case involving sexual assault upon a minor Boy Scout by a

volunteer Boy Scout troop leader, that:

      It is well established that one can be a servant even though the service is

performed gratuitously. *Kowaleski v. Kowaleski*, 235 Ore. 454, 458-59, 385 P.2d
611 (1963). The relevant inquiry in determining whether a master-servant
relationship exists for *respondeat superior* purposes is whether the master has the
right to control the actions of the servant. 235 Ore. at 458-59.

*Lourim*, 328 Or. at 387 (footnote omitted). In connection with the question of ELCA's and/or the

Synod's right to control Veerkamp's actions, ELCA and the Synod offer undisputed evidence that

neither of them retained Veerkamp to perform volunteer lay leadership or youth ministry

services, that neither of them ever made any attempt to dictate his responsibilities in the

provision of those services to the Congregation, that neither of them ever supervised Veerkamp

or had any authority to supervise him in connection with his provision of services to the

Congregation, and indeed that neither of them at any material time knew of Veerkamp's

existence. Prasnikar counters with undisputed evidence that ELCA promulgates standards of

conduct applicable to lay leaders performing volunteer services for individual congregations of

the denomination, that ELCA and the Synod retain the authority to expel congregations from

membership in or affiliation with the national organization in the event of such congregations'

failure to "live in the covenant" of the ELCA constitution, that the synods retain authority to

ensure that rostered congregational leaders oversee teaching and preaching within the

congregation in a manner consistent with the ELCA constitution, that the synods enjoy "appellate

authority" over congregations' decisions to discipline individual congregation members, and that

the Synod did from time to time exercise control over the content of the ecclesiastical teaching of

the Congregation's youth ministers.

The question for the court, therefore, is whether a finder of fact could reasonably

conclude on the basis of the parties' evidentiary proffers that ELCA, the Synod, or both had the

right to control Veerkamp's actions for *respondeat superior* purposes.  I find that neither entity

had the requisite right to control at any material time.  Interpreting the evidence in the light most

favorable to Prasnikar, it is clear that ELCA and the Synod retained and from time to time

actually exercised the right to control the content of the theological and ecclesiastical teachings

of the servants or employees of the Congregation.  By contrast, there is no evidence that either

ELCA or the Synod ever asserted or attempted to exercise any right to control the manner or

place in which those teachings were carried out, or in any other sense to control Veerkamp's

actions in connection with his provision of volunteer services to the Congregation.  Moreover,

although it is reasonable to infer from evidence offered by Prasnikar that ELCA and/or the Synod

had, in consequence of those entities' authority to enforce the "covenant" of the ELCA

constitution (including through expulsion of congregations that may deviate from approved

doctrines and practices), the ability as a practical matter to exert further and broader-reaching

influence over congregational supervision and oversight of lay volunteers, such *de facto*

*influence* (or potential influence) over the Congregation's *relationship* with Veerkamp is

insufficient to satisfy the right-to-control element of the *respondeat superior* analysis, which

requires the *de jure right* to control Veerkamp's *actions* in the course of his provision of services.

I therefore agree with the parties that ELCA and the Synod cannot be liable in connection with

Veerkamp's tortious conduct on a *respondeat superior* theory.

### B.    Prasnikar's Claim of Sexual Battery of a Child Construed as Premised on a General Agency Theory of Vicarious Liability

The Oregon Supreme Court recently affirmed that:

> Classically, an agency relationship "'results from the manifestation of consent by
> one person to another that the other shall act on behalf and subject to his control,

> and consent by the other so to act.'" *Vaughn v. First Transit, Inc.*, 346 Ore. 128,
> 135, 206 P.3d 181 (2009) (emphasis in *Vaughn* omitted) (*quoting Hampton Tree
> Farms, Inc. v. Jewett*, 320 Ore. 599, 617, 892 P.2d 683 (1995)). The agency
> relationship can arise either from actual consent (express or implied) or from the
> appearance of such consent. *See generally Taylor v. Ramsay-Gerding
> Construction Co.*, 345 Ore. 403, 410, 196 P.3d 532 (2008) (so discussing). In
> either circumstance, the principal is bound by or otherwise responsible for the
> actual or apparent agent's acts only if the acts are within the scope of what the
> agent is actually or apparently authorized to do. *Id.*; *see also Beeson v. Hegstad*,
> 199 Ore. 325, 330, 261 P.2d 381 (1953) (one cannot hold principal liable for an
> act that does not fall within the scope of agent's real or apparent authority).

*Eads v. Borman*, 351 Or. 729, 735-736 (2012). Here, Prasnikar argues in support of her agency

theory of ELCA's and the Synod's vicarious liability for sexual battery of a child that Veerkamp

had apparent, but not actual, authority to act as those entities' agent for the purpose of engaging

in the "grooming" conduct described above.

> Under th[e Oregon Supreme C]ourt's settled cases, "apparent authority to do any
> particular act can be created only by some conduct of the principal which, when
> reasonably interpreted, causes a third party to believe that the principal consents to
> have the apparent agent act for him on that matter." *Jones v. Nunley*, 274 Ore.
> 591, 595, 547 P.2d 616 (1976). There accordingly are two keys to the analysis:
> (1) the principal's representations; and (2) a third party's reasonable reliance on
> those representations.

*Id.* at 736 (footnote omitted). The *Eads* court further clarified that:

> As to the first requirement — the representation by a putative principal — an
> agent's actions, standing alone and without some action by the principal, will not
> give rise to apparent authority. *Taylor*, 345 Ore. at 410. Rather, the principal
> must take some affirmative step in creating the appearance of authority, one that
> the principal either intended to cause or "should realize" likely would cause a third
> party to believe that the putative agent has authority to act on the principal's
> behalf. *Badger v. Paulson Investment Co., Inc.*, 311 Ore. 14, 24-25 n 9, 803 P.2d
> 1178 (1991) (*quoting with approval* Restatement (Second)of Agency § 27,
> comment a at 104 (1958)); *accord Taylor*, 345 Ore. at 410-11. The principal's
> words, conduct, or other representation need not be witnessed directly by or made
> directly to the third party, but the representation of authority must be traceable to
> the principal for the principal to be liable on a theory of apparent authority. *Id.*

Page 14 - FINDINGS AND RECOMMENDATION

As to the second key element — reliance — the third party, in deciding to deal with the apparent agent, must in fact rely on the principal's representation, and that reliance must be objectively reasonable. *Jones*, 274 Ore. at 595-96; *see also Badger*, 311 Ore. at 26 (describing reasonable reliance by plaintiff). In assessing the reasonableness of the reliance, the analysis is influenced by what is customary and usual for certain positions or within certain professions. *See Badger*, 311 Ore. at 24 n 9 (generally recognized duties of a position can influence appearance of authority to act as agent (*quoting with approval* Restatement (Second) of Agency § 27, comment a at 104 (1958))).

*Id.* at 737 (footnote omitted).

Where a principal-agent relationship exists, the principal can, under some circumstances, be held liable for the intentional torts of its (non-employee) agent. It is clear, however, that the scope of general agency liability is significantly narrower than *respondeat superior* liability. Whereas in general a principal is liable for *all* torts committed by its *employee* agents acting within the scope of their employment, *see Minnis v. Oregon Mutual Ins. Co.*, 334 Or. 191, 201 (2002), a principal is ordinarily *not* liable for the actions of non-employee agents, *see Jensen v. Medley*, 336 Or. 222, 230 (2003). "Rather, a principal is vicariously liable for an act of its nonemployee agent only if the principal 'intended' or 'authorized the result []or the manner of performance' of that act." *Vaughn v. First Transit, Inc.*, 346 Or. 128, 137 (2009), *quoting* Restatement (Second) of Agency at § 250 *and citing Jensen*, 336 Or. at 231. "In other words, for a principal to be vicariously liable for the negligence of its nonemployee agents, there ordinarily must be a connection between the principal's 'right to control' the agent's actions and the specific conduct giving rise to the tort claim." *Id.* That is, "vicarious liability for an agent's physical torts arises only if the principal has the right to control the agent's *specific injury-causing conduct* in particular." *Eads*, 351 Or. at 738 (emphasis original), *citing Jensen*, 336 Or. at 237-238.

The principal's abstract right of control or right to control an agent in other

Page 15 - FINDINGS AND RECOMMENDATION

respects is not enough. [*Jensen*, 336 Or. at 237-238.]  The law therefore differentiates between employees and other agents for purposes of a principal's tort liability, with the result that, ordinarily, a principal is not liable for the negligence of a nonemployee, because a principal generally does not have the requisite right of control over those nonemployee agents. . . .

\* \* \*

Consequently, although a principal can be vicariously liable for the negligence of an agent who is not an employee, such liability arises only if the principal actually or apparently had a right of control over the agent's injury-causing actions "similar to the control that an employer exercises over an employee." *Vaughn*, 346 Ore. at 139. n7.  The fact that a nonemployee is actually or apparently authorized in some general way to act on a principal's behalf is not a sufficient basis to impose vicarious liability on the principal for the actual or apparent agent's tortious conduct. *Id.* (quoting with approval Restatement (Second) of Agency § 250 comment b). **Rather, to impose vicarious liability for a nonemployee agent's physical conduct, the principal must have — or appear to have — a right to control how the act is performed — that is, "the physical details of the manner of performance" — that is characteristic of an employee-employer relationship.** *Id.* at 139 (citing Restatement (Second) of Agency § 250 comment a).

*Id.* at 738, 739-740 (emphasis supplied; footnote, internal modifications omitted).

ELCA and the Synod do not contest for present purposes that Veerkamp acted in material respects as the Congregation's agent in connection with his grooming of Prasnikar.  However, ELCA and the Synod take the position that neither Veerkamp nor the Congregation was in any material sense the agent of either ELCA or the Synod.  In the alternative, ELCA and the Synod argue that, even if Veerkamp acted as the agent of either or both of them, they cannot be held vicariously liable for his intentional, physical torts because each lacked the requisite right to control the "physical details" of Veerkamp's performance of his service to the Congregation.

As a preliminary matter, I agree with Prasnikar that a finder of fact could reasonably conclude on the basis of the evidentiary record that Veerkamp was in an agency relationship with

both ELCA and the Synod. From the evidence discussed above – including in particular evidence that, under the ELCA national organization's constitution, "youth ministry" is a part of the "evangelical mission" of all three "expressions" of the ELCA denomination, that responsibility for fostering youth organizations is entrusted by ELCA to the regional synods, and that the Oregon Synod relies upon the congregations within its territory to fulfill the denomination's youth-ministry mission – a finder of fact could reasonably conclude that the Congregation was the Synod's agent for purposes of fulfilling the ELCA youth-ministry mandate, and that the Synod was ELCA's agent for those same purposes. Similarly, the evidence of record tends to establish that the Congregation retained Veerkamp on a volunteer basis to act as its agent for purposes of performing GCS small group leader and youth ministry services. The Oregon courts have consistently held that an agent of a second agent is an agent of the second agent's principal, so long as the first agent is charged with assisting the second agent in performing its duties to the ultimate principal. *See, e.g., Vaughn*, 346 Or. at 134, 134 n. 5. Veerkamp's undisputed agency relationship with the Congregation is thus imputable to both the Synod and to ELCA for purposes of determining the merits of ELCA's and the Synod's motion for summary judgment, as a matter of Oregon law.

The fatal flaw in Prasnikar's general agency theory of ELCA's and the Synod's vicarious liability lies not in her failure to establish that Veerkamp can properly be cognized as the agent of each of those entities for material purposes, but rather (as ELCA and the Synod argue in the alternative) in her failure to adduce evidence from which a finder of fact could reasonably conclude that either ELCA or the Synod had any right to control the physical details of the performance of Veerkamp's volunteer duties. As discussed above, ELCA and/or the Synod

Page 17 - FINDINGS AND RECOMMENDATION

retained the express rights to control the content of his theological and ecclesiastical teachings and to impose discipline for any deviation from ELCA-approved doctrine, but the record contains no evidence tending to suggest that either had the right to control the *manner* of Veerkamp's service.  Because such control over the physical details of an agent's service is a *sine qua non* of vicarious principal liability, I agree with ELCA and the Synod that neither of those entities can be held liable for Veerkamp's complained-of intentional torts on a theory of general agency liability.

### III.    Prasnikar's Prayer for Noneconomic Damages (the Congregation's Motion (#49) for Partial Summary Judgment)

As noted above, Prasnikar prays for award of approximately $6,000,000 in noneconomic damages.  The Congregation argues that Prasnikar's prayer should be reduced to $500,000 pursuant to the statutory cap on noneconomic damages set forth at Or. Rev. Stat. 31.710.

On its face, Or. Rev. Stat. 31.710 purports to limit the amount that a court may award a plaintiff as noneconomic damages to $500,000.  Section 31.710 specifically provides, in relevant part, as follows:

(1)    Except for claims subject to ORS 30.260 to 30.300 and ORS chapter 656, in any civil action seeking damages arising out of bodily injury, including emotional injury or distress, death or property damage of any one person including claims for loss of care, comfort, companionship and society and loss of consortium, the amount awarded for noneconomic damages shall not exceed $500,000.

(2)    As used in this section:

* * *

(b)    "Noneconomic damages" means subjective, nonmonetary losses, including but not limited to pain, mental suffering, emotional distress, humiliation, injury to reputation, loss of care, comfort, companionship and society, loss of consortium, inconvenience and interference with normal and usual activities apart from gainful

employment.

(3)      This section does not apply to punitive damages.

(4)      The jury shall not be advised of the limitation set forth in this section.

Or. Rev. Stat. 31.710.

In *Greist v. Phillips*, 322 Or. 281 (1995), the Oregon Supreme Court found that Section 31.710 was not unconstitutional with respect to Article I, Section 10, of the Oregon Constitution (the "Remedies Clause"), which provides in part that "every man shall have remedy by due course of law for injury done him," Or. Const., Art. 1, § 10, notwithstanding that its operation may reduce a remedy below a level determined by a finder of fact adequately to compensate a plaintiff for an injury. *See Greist*, 322 Or. at 290-291. The *Greist* court noted its previous holding that the legislature may alter or even abolish an available remedy without violating the Remedies Clause "so long as the party injured is not left entirely without a remedy. . . [and that the remaining] remedy need not be precisely of the same type or extent [as the remedy that existed prior to legislative action]; it is enough that the remedy is a substantial one," *Hale v. Port of Portland*, 308 Or. 508, 523 (1989), and on that basis reasoned that "the legislature is entitled to amend the amount of damages available in a statutory wrongful death action without running afoul of Article I, section 10, as long as the plaintiff is not left without a substantial remedy." *Greist*, 322 Or. at 290 (finding that $500,000 in noneconomic damages was a "substantial remedy").

The Oregon Supreme Court subsequently clarified that, even as to nonstatutory causes of action that clearly existed at the common law in 1857 (the year the Oregon Constitution was adopted), operation of Section 31.710 does not violate the Remedies Clause so long as the

Page 19 - FINDINGS AND RECOMMENDATION

remedy that remains following reduction of the award is "substantial." *See Howell v. Boyle*, 353 Or. 361, 373-374 (2013). In addition, the *Howell* court's discussion of how the substantiality of a post-reduction remedy is to be weighed made clear that a remedy's substantiality is to be determined by reference to the magnitude of the jury's pre-reduction award. *See id.* at 374-377. Although the *Howell* court expressly did not describe the "precise contours" of the necessary analysis, it opined that the reduction of a jury award by 99% would not leave a plaintiff with a constitutionally substantial remedy, and would therefore be constitutionally defective, *see id.* at 375, *citing Clarke v. OHSU*, 343 Or. 581 (2007), whereas the reduction of a jury award by approximately 83% would leave the plaintiff with a substantial remedy, and would therefore be constitutional, *see id.* at 376, *citing Hale v. Port of Portland*, 308 Or. 508 (1989). After *Howell*, it is therefore clear that regardless of whether an action is statutory or common-law, and regardless of whether the action would have been recognized by an Oregon court of 1857, operation of Section 31.710 does not offend the Remedies Clause so long as the post-operation remedy is not constitutionally insubstantial by reference to the finder of fact's pre-operation noneconomic damages award.

The *Greist* court further found that, as to purely statutory causes of action that "exist only in the form and with the limitations chosen by the legislature," Section 31.710 did not violate Article I, Section 17, of the Oregon Constitution (the "Right to Jury Trial Clause," which provides that "[i]n all civil cases the right of Trial by Jury shall remain inviolate," Or. Const., Art. 1, § 17), because as of 1857 (the year the Oregon Constitution was adopted), the Right to Jury Trial Clause did not protect a right to trial by jury of any such cause of action. *See Greist*, 322 Or. at 293-295.

Page 20 - FINDINGS AND RECOMMENDATION

By contrast, in *Lakin v. Senco Prods., Inc.*, 329 Or. 62 (1999), the Oregon Supreme Court found that, specifically as to causes of action recognized by the common law as it existed in 1857 – and as to "cases of like nature" – Section 31.710 was unconstitutional with respect to the Right to Jury Trial Clause. *See Lakin*, 329 Or. at 81 (holding that a statutory cap on noneconomic damages "violates Article I, section 17, of the Oregon Constitution, and, thus, is void with respect to cases to which the constitutional provision applies"). The *Lakin* court reasoned that, as to civil actions recognized at common law in 1857, the Right to Jury Trial Clause mandates that "the trial of all issues of fact must be by jury," including the determination of damages in a personal injury case. *Id.* at 82. On that basis, the *Lakin* court found that Section 31.710 could not constitutionally be applied to jury awards of noneconomic damages in such actions: "The legislature may not interfere with the full effect of a jury's assessment of noneconomic damages, at least as to civil cases in which the right to jury trial was customary in 1857, or in cases of like nature." *Id.* at 82.

To the extent there may have been an appearance of tension between the Oregon Supreme Court's Right to Jury Trial Clause jurisprudence in *Greist* and *Lakin*, the Oregon Court of Appeals addressed and dispelled it in *Hughes v. Peacehealth*, 204 Or. App. 614 (2006). The *Hughes* court noted that *Lakin* did not overrule or limit *Greist*, but rather addressed a class of causes of action entirely outside the scope of *Greist*'s holding. *See Hughes* at 618-622. That is, the *Hughes* court expressly found that *Greist*'s holding survived *Lakin*, and applied only to statutory causes of action that would not have lain at the common law in 1857, and that the holding of *Lakin* was applicable only to causes of action "of like nature" to causes of action with origins in the common law as it stood in 1857. *See id.* at 621-622.

Page 21 - FINDINGS AND RECOMMENDATION

Some guidance as to whether a claim is "of like nature" to a claim with origins in the common law as it stood in 1857 may be gleaned from the Oregon Supreme Court's decision in *Klutschkowski v. Peacehealth*, 354 Or. 150 (2013). The *Klutschkowski* court was presented with an appeal from an award of damages in excess of the statutory cap made to an infant child for injuries suffered during the birthing process. The court noted that actions for negligence and for medical malpractice existed at the common law in 1857, and therefore followed the principle that a plaintiff bringing an action for negligence or for malpractice was therefore entitled to the protections of the Right to Jury Trial Clause "unless [the court be] persuaded that an action comes with an exception" that would have barred such an action in 1857. *Klutschkowski*, 354 Or. at 176. The court considered the defendants' argument suggesting that the common-law did not recognize prenatal injuries as compensable, but rejected it on the ground that defendants' cited cases did not clearly establish that *all* prenatal injuries were not compensable. *See id.* at 171-176. On that basis, and citing *Lakin* in support, the *Klutschkowski* court found that Section 31.710 could not constitutionally be applied to the plaintiff's negligence and malpractice claims. *See id.* at 177. The court's decision expressly left open the possibility that Section 31.710 could not be constitutionally applied to any non-statutory, common-law cause of action, without regard to whether the cause of action would have been recognized as such in 1857. *See id* at 169 n. 11.

Here, the Congregation concedes – correctly – that sexual battery, including sexual battery of a child, would have been a cognizable claim in connection with which a plaintiff would in the usual course have had a right to trial by jury in 1857. However, the Congregation argues, first, that Prasnikar would nevertheless have had no right to a jury trial of her sexual battery claim against it under the common law of 1857, because the Congregation has at all

Page 22 - FINDINGS AND RECOMMENDATION

material times been a charity, and charities have during a period of Oregon's history enjoyed

immunity to suit under some circumstances, including immunity to vicarious liability for the acts

of their agents. I agree with the Congregation that in 1912, the Oregon Supreme Court held that

"[c]orporations organized solely for educational purposes to which all their revenues must be

applied are charitable institutions, and, as such are not liable for the negligent acts of their

servants, notwithstanding tuition fees are received for technical knowledge imparted to their

students." *Hill v. Tualatin Acad.*, 61 Or. 190, 196 (1912). However, "[c]haritable immunity

came to Oregon [for the first time] in *Hill v. Tualatin Academy*, 61 Ore. 190, 121 P. 901 (1912)

[55 years after the Oregon Constitution was adopted]. Its history in this state is reviewed in the

dissenting opinion in the *Landgraver* [*v. Emanuel Lutheran Charity Board*, 203 Or. 489, 505

(1955)] case." *Hungerford v. Portland Sanitarium & Benevolent Asso.*, 235 Or. 412, 416 (1963).

The *Hungerford* court expressly abolished the charitable immunity doctrine in Oregon in 1963.

*See id.* at 414, 416. The Congregation's argument that, because the Oregon courts recognized a

doctrine of charitable immunity during the period from 1912 through 1963, the Oregon common

law must necessarily have recognized that same doctrine in 1857, is unpersuasive. Indeed, to the

contrary, the cases establish that for a 51-year period from 1912 to 1963, the Oregon courts

detoured into a principle of charitable immunity that was not recognized at the common law

either before or after that period, suggesting, if anything, that charitable immunity proved

unworkable as a legal principle. Nothing in that history could reasonably support the inference

that charitable immunity would necessarily have been embraced by the courts 55 years before

commencement of their failed experiment with such immunity. The Congregation's motion

should therefore be denied as to Prasnikar's noneconomic damage claim to the extent premised

on the Congregation's charitable immunity argument.

The Congregation argues, second, that at common law in 1857 there was no *respondeat superior* liability for the *unauthorized* and *willful* tortious acts of an agent outside the scope of the agent's employment.  The Congregation argues that the Oregon Supreme Court's 1988 decision in *Chesterman* marks the first occasion on which the Oregon courts extended an employer's *respondeat superior* liability to acts undertaken by an employee outside the scope of employment.  Based on that characterization of *Chesterman, supra*, the Congregation argues that in 1857 Prasnikar would have faced an absolute bar to suit on her *respondeat superior* claim.  However, while I agree with the Congregation that in 1857 the Oregon courts would not have recognized an employer's *respondeat superior* liability for the intentional torts of its employee undertaken outside the scope of employment, I note that Prasnikar has not alleged such a tort as the basis for her claim against the Congregation.  To the contrary, it is Prasnikar's position that the acts of sexual abuse were *caused by* or *resulted from* acts within the scope of Veerkamp's employment, namely the "grooming" conduct discussed above.  While I am persuaded that Prasnikar's factual *theory of causation* of the abuse she suffered would have appeared novel to an 1857 jury or court, had an 1857 court been persuaded of the factual validity of that theory, nothing in the case law suggests that there would or could have been any legal impediment preventing Prasnikar from taking her claim to a jury on a *respondeat superior* basis.  That is, if *in fact* Prasnikar's injuries were caused by an action taken in furtherance of Veerkamp's employment duties, the Congregation's vicarious liability therefor would follow under principles of agency as they existed in 1857.  The Congregation's motion should therefore be denied as to Prasnikar's noneconomic damage claim to the extent premised on the Congregation's *respondeat*

Page 24 - FINDINGS AND RECOMMENDATION

*superior* argument.

**IV.    Prasnikar's Prayer for Punitive Damages (ELCA's and the Synod's Motion (#45) for Summary Judgment; the Congregation's Motion (#49) for Partial Summary Judgment)**

As noted above, Prasnikar prays for award of approximately $10,000,000 in punitive damages.  Both ELCA and the Synod and the Congregation move to strike that prayer in its entirety.

The Oregon Supreme Court has affirmed that where a principal is vicariously liable for the acts of its agent, punitive damages are available against the principal based solely on the agent's actions, so long as punitive damages would be available against the agent and the agent's conduct giving rise to exposure to punitive damages occurred within the scope of the agent's agency:

> A majority of courts have adopted the rule that, if the servant has committed a tort within the scope of his employment so as to render the corporation liable for compensatory damages, and if the servant's act is such as to render him liable for punitive damages, then the corporation is likewise liable for punitive damages.
>
> * * *
>
> * * *
>
> Under this test, when an employee commits a wrongful act which would subject him personally to punitive damages, **the essential inquiry must be whether the act was committed while the employee was acting within the scope of his employment**, that is:
>
> > whether the servant at the time of the commission of the injury was performing a service for the master in furtherance of the master's business, not whether it was done in exact observance of detail prescribed by his employer. . . .
>
> If the employee was acting within the scope of his employment, the corporation will be liable for punitive damages . . . .

Page 25 - FINDINGS AND RECOMMENDATION

> We feel that this rule represents the better view with regard to the liability of a corporation for punitive damages, and is the only rule compatible with this court's prior statements that punitive damages are justified as a deterrent to prevent the violation of societal interests.

*Stroud v. Denny's Restaurant, Inc.*, 271 Or. 430, 435-437 (1975) (citations, internal quotation marks omitted; emphasis supplied); *see also Johannesen v. Salem Hosp.*, 336 Or. 211, 219 (2003) (expressly rejecting the theory that a vicarious-liability defendant "cannot be held vicariously liable for punitive damages without evidence of fault on its part" and finding "no reason to revisit" the *Stroud* court's holding).

Notwithstanding the foregoing, Oregon's punitive-damages jurisprudence clearly establishes that the *raisons d'être* of punitive damages in general are the state's "legitimate interests in punishment and deterrence," *Hamlin v. Hampton Lumber Mills, Inc.*, 349 Or. 526, 533 (2011), *quoting BMW of N. Am. v. Gore*, 517 U.S. 559 (1996), and that the justification of vicarious punitive damages rests on that same foundation, namely to deter employers from authorizing employees to commit tortious acts, and to punish them when they do so, *see Stroud*, 271 Or. at 437. While, as noted above, Prasnikar takes the position here that the abuse she suffered was caused by or resulted from conduct undertaken within the scope of Veerkamp's duties to the Congregation, it is emphatically not the case that any evidence of record suggests that the Congregation, ELCA, or the Synod intended or authorized the tortious abuse itself, or indeed that any of those entities should have understood that sexual abuse was likely to result from Veerkamp's provision of youth-ministry services. In the absence of any such evidence, imposition of vicarious punitive damages on the Congregation, ELCA, or the Synod would not have the effect of deterring further such misconduct by any agent thereof or of punishing a

principal for authorizing an agent's torts. For that reason, and because no Oregon court has ever suggested that a master could be vicariously liable for punitive damages on the basis of intentional conduct by the master's servant of a kind the servant was not hired or instructed to perform, I recommend that each set of moving defendants' motions for summary adjudication be granted as to Prasnikar's prayer for punitive damages to the extent directed at them, and that Prasnikar's prayer for punitive damages be stricken to the extent it seeks award of punitive damages against ELCA, the Synod, and/or the Congregation.

## V.    ELCA's and the Synod's Oral Motion (#80) to Stay Expert Discovery

Because, for reasons set forth above, ELCA and the Synod are entitled to summary adjudication in their favor of each of Prasnikar's claims against them, those entities should be dismissed as parties to this action. In consequence, ELCA's and the Synod's oral motion for stay of expert discovery should be denied as moot.

## CONCLUSION

For the reasons set forth above, the ELCA's and the Synod's motion (#45) for summary judgment should be granted, the Congregation's motion (#49) for partial summary judgment should be granted as to Prasnikar's negligence claim and prayer for punitive damages and otherwise denied, Prasnikar's prayer for punitive damages should be stricken to the extent it seeks award of punitive damages against ELCA, the Synod, and/or the Congregation, and ELCA's and the Synod's oral motion (#80) to stay expert discovery should be denied as moot.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections

are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 24th day of October, 2014.

Honorable Paul Papak
United States Magistrate Judge