IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**CRISTIE MARIE PRASNIKAR,**

           Plaintiff,

   v.

**OUR SAVIOR'S LUTHERAN CHURCH
OF LAKE OSWEGO, OREGON; OREGON
SYNOD OF THE EVANGELICAL
LUTHERAN CHURCH IN AMERICA;
EVANGELICAL LUTHERAN CHURCH
IN AMERICA;** and **RALPH W. ("WOODY")
VEERKAMP,**

           Defendants.

No. 3:13-cv-00258-PK

OPINION AND ORDER

**MOSMAN, M.,**

On October 24, 2014, Magistrate Judge Papak issued his Findings and Recommendation ("F&R") [82] in the above-captioned case recommending that a judgment be entered granting Defendant Evangelical Lutheran Church in America's ("ECLA") and Defendant Oregon Synod of the Evangelical Lutheran Church in America's ("Synod") Motion for Summary Judgment [45] in its entirety, and granting Defendant Our Savior's Lutheran Church of Lake Oswego, Oregon's ("Congregation") Motion for Summary Judgment [49] with respect to Ms. Prasnikar's negligence claim and prayer for punitive damages, and denying it in all other respects. Judge

Papak also recommended that the ECLA's and the Synod's oral motion to stay expert discovery be denied as moot.

On November 11, 2014, the Congregation filed objections to Judge Papak's F&R [89]. The Congregation argued that Judge Papak erred in denying its summary judgment motion with respect to capping Ms. Prasnikar's prayer for noneconomic damages at $500,000.

On November 12, 2014, Ms. Prasnikar filed objections to Judge Papak's F&R [90]. Ms. Prasnikar argued that Judge Papak erred in granting the ECLA's and the Synod's summary judgment motion with respect to those entities' vicarious liability for Mr. Veerkamp's actions.

## LEGAL STANDARD

The magistrate judge makes only recommendations to the court, to which any party may file written objections. The court is not bound by the recommendations of the magistrate judge, but retains responsibility for making the final determination. The court is generally required to make a de novo determination regarding those portions of the report or specified findings or recommendation as to which an objection is made. 28 U.S.C. § 636(b)(1)(C). However, the court is not required to review, de novo or under any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the F&R to which no objections are addressed. *See Thomas v. Arn*, 474 U.S. 140, 149 (1985); *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003). While the level of scrutiny under which I am required to review the F&R depends on whether or not objections have been filed, in either case, I am free to accept, reject, or modify any part of the F&R. 28 U.S.C. § 636(b)(1)(C).

**DISCUSSION**

I. **Negligence Claim, Prayer for Punitive Damages and Expert Discovery Stay Recommendations**

Neither party filed any objections to Judge Papak's recommendation that: (1) Ms. Prasnikar's negligence claim be dismissed as time barred; (2) Ms. Prasnikar's prayer for vicarious punitive damages against the ECLA, the Synod, and the Congregation fails as a matter of law; and (3) the ECLA's and the Synod's motion to stay expert discovery should be denied as moot. I therefore adopt these portions of the F&R as my own. Ms. Prasnikar's negligence claim and prayer for vicarious punitive damages are dismissed, and the ECLA's and the Synod's motion to stay expert discovery is denied as moot.

II. **The ECLA's and The Synod's Vicarious Liability**

In his F&R, Judge Papak analyzed two possible theories for holding the ECLA and the Synod vicariously liable for Mr. Veerkamp's actions: (1) *respondeat superior*, and (2) general agency theory. (F&R [82] at 9.) Judge Papak concluded that both theories failed as a matter of law. (*Id.* at 13, 18.) Ms. Prasnikar argues that Judge Papak erred in his treatment of either the facts or law with respect to both theories. I find that Ms. Prasnikar's objections lack merit, and therefore affirm the reasoning and conclusions of the F&R and adopt them as my own.

A. *Respondeat Superior Theory of Vicarious Liability*

Ms. Prasnikar's main contention appears to be that Judge Papak failed to account for several pieces of evidence that suggest that the ECLA and the Synod did in fact directly control Mr. Veerkamp's actions. (Pl.'s Objections [90] at 6.) The ECLA's and the Synod's ability to directly control Mr. Veerkamp's actions is critical to the *respondeat superior* analysis. In order for *respondeat superior* to provide an avenue for vicarious liability, Mr. Veerkamp must have been an employee of the ECLA or the Synod. *See Chesterman v. Barmon*, 305 Or. 439, 442

(1988) (citations omitted). In order to be considered an employee of either the ECLA or the

Synod, the "employer" entity has to have had the right to control Mr. Veerkamp's actions. *See*

*Lourim v. Swenson*, 328 Or. 380, 387 (1999) (footnote omitted).

      Ms. Prasnikar first argues that the Congregation's admission that it was at all material

times subject to the oversight, direction, control and discipline of the ECLA and the Synod

created a genuine dispute of a material fact regarding who was Mr. Veerkamp's employer that

could only be resolved at trial. (*Id.* at 6–7.) Ms. Prasnikar argues that this admission is in direct

conflict with the ECLA's and the Synod's position that it did not have direct control over the

Congregation with respect to Mr. Veerkamp's actions. I disagree with Ms. Prasnikar. I believe

that the argument Ms. Prasnikar would try to advance with this admission is that if the

Congregation was completely controlled by the ECLA or the Synod, it follows that

Mr. Veerkamp, who was an employee of the Congregation, was also completely controlled by

the ECLA and the Synod and was therefore their employee as well. However, the fact that the

Congregation admitted that it was at all material times subject to the oversight, direction, control

and discipline of the ECLA and the Synod does not tell us anything about the scope of that

oversight or control. As demonstrated below, the material aspects of the ECLA's and the

Synod's oversight and control of the Congregation, namely regarding lay volunteers like Mr.

Veerkamp, are not disputed—the ECLA and the Synod lacked complete control. I therefore find

that this admission by the Congregation does not create a genuine dispute about a material fact.

Ms. Prasnikar's first claim of error is without merit.

      Ms. Prasnikar's next claim of error is that Judge Papak failed to properly account for the

powers the Synod's Constitution gave it over the Congregation. It is undisputed that the Synod's

Constitution gave it the primary responsibility for fostering youth ministry in the congregations

within its geographical boarders. (Pl.'s Objection [90] at 7–8.) It is also undisputed that the Synod had the power to discipline individual congregations that did not implement youth ministry programs that were consistent with churchwide policy. (*Id.*) Ms. Prasnikar argues that because the Congregation had day to day control of Mr. Veerkamp's activities in its youth ministry program, and because the Synod was ultimately responsible for making sure that the program was run according to churchwide policy, and it had disciplinary power to enforce that policy, a jury could infer that the Synod had *de jure* control over Mr. Veerkamp. I agree with Judge Papak and the Defendants' response that this type of oversight is too attenuated. It is undisputed that neither the ECLA nor the Synod ever made an attempt to dictate Mr. Veerkamp's responsibilities, and that the ECLA nor the Synod ever supervised Mr. Veerkamp or had the authority to do so. (F&R at 12.) Additionally, the Synod Constitution is clear that its disciplinary powers are limited to congregations, ordained ministers, and persons on the official lay roster— those power do not extend to non-roster lay volunteers like Mr. Veerkamp. (Pl.'s Objections [90] at 8.) At best, the ECLA and the Synod had power to influence the Congregation's control over Mr. Veerkamp. I disagree that a rationale jury could conclude with these facts that the ECLA or the Synod had control of Mr. Veerkamp—a necessary element of a *respondeat superior* theory of vicarious liability. *See Lourim*, 328 Or. at 387.

Ms. Prasnikar next argues that Judge Papak failed to properly account for the extent to which the Synod exercised absolute control over the teaching and preaching of the church. (Pl.'s Objections [90] at 9.) I agree with Defendants' reply that Ms. Prasnikar has mischaracterized much of the deposition testimony she uses to support this claim. First, the deposition testimony cited by Ms. Prasnikar for the proposition that the Synod has absolute control over the teaching and preaching of the church never speaks to the Synod's power over non-roster lay volunteers,

but rather only to its power over pastor's teaching and preaching. (Dep. of David Brauer-Rieke [66-4] at 20–23.) Second, Ms. Prasnikar's assertion that members of the Congregation turn to the Synod to fire non-roster youth ministers who teach about unapproved subjects is without support. Ms. Prasnikar cites a letter in support of this proposition, but the letter she cites was written to the local pastor, not the Synod. (Letter to Thomas Ashbrook [71-3].) In addition, the youth minister in question was not "promptly removed" as Ms. Prasnikar states, but rather he was asked to resign due to longstanding general performance issues and not because of his questionable activity that led to the cited letter being written. (Dep. of Thomas Ashbrook [95-1] at 2–3.) Third, Ms. Prasnikar states that the Bishop for the Synod admitted that he had the power to ensure that unapproved teaching was stopped through his disciplinary powers. (Pl.'s Objections [90] at 12.) Again, however, Ms. Prasnikar fails to tell the whole story. The Bishop of the Synod was clear that he had the power to discipline rostered leaders, and that unrostered leaders, such as Mr. Veerkamp, could only be disciplined by the Congregation itself. (Dep. of William Boerger [66-3] at 14–15.) Nothing cited by Ms. Prasnikar about the Synod's ability to control the teachings presented by ordained ministers and persons on the official lay roster supports her position that a non-roster lay volunteer should be treated as an employee for purposes of her *respondeat superior* theory. It all, in fact, supports the Defendants' position that non-roster lay volunteers are outside of the ELCA's and Synod's control and therefore cannot be considered employees for *respondeat superior* purposes.

I find that it is appropriate to grant summary judgment in Defendants' favor with regards to Ms. Prasnikar's *respondeat superior* theory of vicarious liability because she has failed to come forward with any evidence suggesting that the ELCA or the Synod had sufficient control over Mr. Veerkamp to establish an employer-employee relationship.

6 – OPINION AND ORDER

**B.    *General Agency Theory of Vicarious Liability***

Ms. Prasnikar argues that Judge Papak erred in finding that she lacked sufficient evidence to hold the ELCA and the Synod vicariously liable under a general agency theory. (Pl.'s Objections [90] at 12.) Ms. Prasnikar objects on the grounds that Judge Papak applied the wrong legal standard. Ms. Prasnikar argues that the Oregon Supreme Court's decision in *Jensen v. Medley* establishes two different standards for vicarious liability under a general agency theory, one for physical acts, and the other for non-physical acts. 336 Or. 222 (2003). She believes that this case is one that involves non-physical acts and that she can meet that standard.

I see nothing in *Jensen* that suggests the Oregon Supreme Court set up two standards for vicarious liability in the agency context. The Oregon Supreme Court said in relevant part:

> [T]he fact that a principal has the right to control some acts of its non-servant agent in furtherance of the principal's business does not mean that the principal has the right to control all those acts. If a principal were liable for all the torts of a non-servant agent performed in furtherance of the principal's business, whenever there was some evidence that the principal had a "right to control" the agent only in some respects, then the principal could face liability for conduct of the agent that the principal did not in fact control or have a right to control. The law of agency does not extend that far.

336 Or. at 238. The Oregon Supreme Court was very clear that a key element of any vicarious liability claim under any agency theory is the ability to control the agent. Ms. Prasnikar's own rule for cases involving intentional, non-physical conduct requires a showing that the master controlled the agent with respect to the conduct that gave rise to the claim. (Pl.'s Objections [90] at 15.) Because, as discussed above, Ms. Prasnikar has no evidence to show that the ELCA or the Synod had the power to control Mr. Veerkamp's actions in his role as a youth group leader, her agency theory of vicarious liability fails as a matter of law. I therefore find it appropriate to adopt this

portion of the F&R and grant summary judgment in favor of Defendants with respect to this theory of vicarious liability.

**III.    Ms. Prasnikar's Prayer for Noneconomic Damages**

In his F&R, Judge Papak concluded that an Oregon statute that caps noneconomic damages at $500,000 is unconstitutional under the Oregon Constitution as applied to this case. (F&R [82] at 18–24.) Under Oregon law, a plaintiff in a civil action seeking damages arising out of bodily injury may not recover noneconomic damages in excess of $500,000. ORS 31.710. In reviewing the constitutionality of a cap on damages, the Oregon Supreme Court looks to Article 1, §§ 10 and 17 of the Oregon Constitution. Article 1, § 10 is used to review laws that create exclusive remedies or place absolute bars on certain types of remedies. *See Lawson v. Hoke*, 339 Or. 253 (2005); *Smothers v. Gresham Transfer, Inc.*, 332 Or. 83 (2001). This is not our case. Because ORS 31.710 creates a limit and not a bar on certain types of remedies, it should be reviewed under Article 1, § 17.

Article 1, § 17 of the Oregon Constitution states that, "In all civil cases the right of Trial by Jury shall remain inviolate." OR. CONST. art. 1, § 17. The Oregon Supreme Court has held that this section "prohibits the legislature from interfering with the full effect of a jury's assessment of noneconomic damages, at least as to civil cases in which the right to jury trial was customary in 1857, or in cases of like nature." *Lakin v. Senco Prod's, Inc.*, 329 Or. 62, 78 (1999). Therefore, the question for determining whether ORS 31.710 is constitutional as applied to this case is, "Does Ms. Prasnikar have a claim that is at least similar to a claim that would have resulted in a jury trial in Oregon in 1857?"

The Congregation argues in its objections to the F&R that the answer to this question is no. The Congregation argues that Ms. Prasnikar's sexual battery claim would not have resulted

in a jury trial in 1857 because either (1) the doctrine of charitable immunity in place at the time would have barred her claim as a matter of law, or (2) her theory of *respondeat superior* would have failed as a matter of law. The Congregation believes that Judge Papak erred when he rejected both of these arguments in his F&R. He did not believe that the doctrine of charitable immunity was in place in Oregon in 1857, and he did not believe that Ms. Prasnikar's *respondeat superior* argument would have been rejected in 1857.

In her response to the Congregation's objections, Ms. Prasnikar argues that I should not even consider the Congregation's arguments. She argues that "the court need not consider affirmative defenses that might be considered in 1857." (Pl.'s Resp. [91] at 9.) I disagree that I should disregard all affirmative defenses. In the context of analyzing a bar in noneconomic damages under Article 1, §10, the Oregon Supreme Court emphasized that a reviewing court must look at a complete statement of the pertinent facts. *Lawson*, 339 Or. at 259. In *Lawson*, a case upholding a bar noneconomic damages, the court held that although the plaintiff could clearly bring a claim in 1857 for the injuries sustained from the negligent actions of another driver, it was important to account for the fact that under the common law in 1857 her negligence claim would be barred by the fact that the she was breaking the law by driving without a license at the time her injuries were sustained. *Id.* at 264–65. I see no reason why I should not apply the same principle here. Defenses that would act as a total bar to Ms. Prasnikar's claim in 1857 show that "the right to jury trial was [not] customary in 1857 . . . ." *Lakin*, 329 Or. at 78.

After considering the parties' arguments, I respectfully disagree with Judge Papak's conclusions regarding charitable immunity and Ms. Prasnikar's *respondeat superior* theory. I believe that both charitable immunity and Ms. Prasnikar's novel *respondeat superior* theory would have barred her claim from reaching a jury in 1857. Therefore, I do not believe that ORS

31.710 is unconstitutional as applied to this case, and as a result Ms. Prasnikar's noneconomic

damages should be capped at $500,000.

**A.    *Charitable Immunity***

The Congregation argues that the doctrine of charitable immunity would have acted as a

total bar to Ms. Prasnikar's claim, thus preventing it from being the type of claim in which the

right to a jury trial was customary in 1857. (Def.'s Objections [89] at 12.) The Congregation

points to an Oregon Supreme Court decision from 1912 that cited an 1846 British case for the

proposition that:

> Though an action may be maintained against an officer, servant, or employé of a
> charitable institution to recover damages for an injury caused by the act or
> omission of such person, the action must be against him in his individual, and not
> in his corporate, capacity, so that, if a recovery is awarded, it will not be
> discharged from the trust funds.

*Hill v. President and Tr. of Tualatin Acad. and Pac. Univ. et al.*, 61 Or. 190, 199 (1912) (citing

*Feoffees of Heriot's Hospital v. Ross*, 8 Eng. Rep. 1508 (H.L. 1846)). The Congregation argues

that this establishes that the common law of Oregon in 1857 would have accepted the doctrine of

charitable immunity as a bar to Ms. Prasnikar's claim. I agree.

First, there is nothing in *Hill* that suggests that the court thought it was announcing a new

rule. Without much fanfare or build up, the Oregon Supreme court cited *Feoffees* to support the

doctrine of charitable immunity. There is none of the language in the opinion, either before or

after the quoted passage, that one typically expects to see when a court is announcing a new rule.

The Oregon Supreme Court gave no indication that it was doing anything other than applying the

law as it had always been.

Second, the doctrine of charitable immunity was abolished in England in 1866. *See*

*Mersey Docks Trustees v. Gibbs*, 11 Eng. Rep. 1500 (1866). It is hard to imagine why the state of

Oregon in 1912 would use an 1846 British case as support to adopt, for the first time, a doctrine of charitable immunity when England overturned the holding of that 1846 case in an 1866 decision. *Id.* A more likely story is that, like England in 1848, Oregon in 1857 had a doctrine of charitable immunity, and although England decided to abolish that doctrine in 1866, Oregon chose to maintain that doctrine until 1963. *See Hungerford v. Portland Sanitarium & Benevolent Assoc.*, 235 Or. 412 (1963).

Third, the earliest case in the United States applying charitable immunity, like *Hill*, does not contain any language suggesting that it was announcing a new rule. *See McDonald v. Mass. Gen. Hosp.*, 120 Mass. 432, 436 (1876) ("[I]f there has been no neglect on the part of those who administer the [charitable] trust and control its management, and if due care has been used by them in the selection of their inferior agents, even if injury has occurred by the negligence of such agents, it cannot be made responsible.") This adds support to the idea that charitable immunity was viewed as part of the common law adopted from England, and not a new creature re-created in the United States after a failed test run in England between 1846 and 1866.

Finally, Judge Papak, in support of the postion that *Hill* created a new charitable immunity rule in Oregon, points to a line in *Hungerford* where the Oregon Supreme Court said, "Charitable immunity came to Oregon in *Hill v. Tualatin Academy*." *Hungerford,* 235 Or. at 416. While one could certainly interpret that as meaning that charitable immunity was created in Oregon by the *Hill* decision, the Oregon Supreme Court has made other statements pointing the other way. In *Landgraver v. Emanuel Lutheran Charity Board, Inc.*, the Oregon Supreme Court, in support of charitable immunity, said, "From the beginning, the overriding public policy of this state, as evidenced by many legislative acts, has been to protect the assets of charitable institutions from use for any purpose other than that for which they were organized." *Landgraver*

*v. Emanuel Lutheran Charity Bd., Inc.*, 203 Or. 489, 493 (1955). It is unclear how to reconcile these statements, and therefore I view them as neutral in neither supporting nor refuting the position that the doctrine of charitable immunity existed in Oregon in 1857.

While the above analysis does not definitively result in a conclusion that charitable immunity was part of the common law in Oregon in 1857, that conclusion is the most likely one. Oregon has recognized that "it is exceedingly difficult to determine the state of Oregon law over 150 years ago." *See Howell v. Boyle*, 353 Or. 359, 386 (2013). Instead of determining with "certainty" the state of the law in 1857, Oregon recognizes that all a court can do is "mak[e] the best of the limited historical resources at the court's disposal." *Id.* Given what is available to the court, the most likely conclusion appears to be that the Oregon Supreme Court did not announce a new rule in *Hill*, and that the doctrine of charitable immunity was part of the common law in Oregon in 1857 when its state constitution was drafted.

Given this conclusion, I believe that Ms. Prasnikar's claim in 1857 would have been decided as a matter of law under the doctrine of charitable immunity, and there would have been no factual questions for a jury to decide. Because the amount of her damages would not have been decided by a jury in 1857, the application of ORS 31.710 in this action does not violate her state constitutional right to a jury trial.

### B.    *Respondeat Superior*

Even if the doctrine of charitable immunity was not part of the common law in Oregon in 1857, Ms. Prasnikar's claim still would have been decided as a matter of law under the doctrine of *respondeat superior*. Both parties seem to agree that *French v. Cresswell*, although decided in 1886, contains the best description of the state of the *respondeat superior* doctrine in Oregon in 1857. 13 Or. 418 (1886). In that decision, the Oregon Supreme Court held,

> A master is liable for the acts of his servant, done within the scope of his authority, although the servant disobeyed instructions. The former is only shielded from liability when the latter steps outside his general duty, and does an act to subserve his own interest or gratify his passions.

*Id.* at 425. Under this rule, it is quite clear that the Congregation cannot be held vicariously liable for the sexual battery of Ms. Prasnikar. The sexual battery of a minor can in no way be considered within the scope of Mr. Veerkamp's employment. Additionally, there is no cognizable story for how his acts could possibly have been intended to benefit the Congregation—they were clearly done to serve his own interest and to gratify his passions.

Ms. Prasnikar argues, and Judge Papak agreed, that she is advancing a more nuanced theory of *respondeat superior* liability, and it is one that a court in 1857 would have found novel, but still acceptable. Ms. Prasnikar argues that she is not suing based on Mr. Veerkamp's intentional tort outside of the scope of his employment, but rather she is suing based on the "grooming" that Mr. Veerkamp did, which was within the scope of his employment, and which was a necessary precursor to his abuse and the resulting harm. (Pl.'s Resp. [91] at 12.) Essentially, Ms. Prasnikar's theory is that Mr. Veerkamp, while acting within the scope of his employment, set in motion a chain reaction of events that resulted in numerous instances of sexual battery. That chain of events would look something like this:

1. Mr. Veerkamp cultivated a relationship of trust with Ms. Prasnikar—something he was expected to do as a youth group leader (i.e. within the scope of his employment).

2. The relationship of trust resulted in Mr. Veerkamp being in a position where he could begin kissing and fondling Ms. Prasnikar in the autumn of 1994.

13 – OPINION AND ORDER

3. This kissing and fondling created a situation where Mr. Veerkamp, by the spring of 1995, was then able to progress to engaging in acts of oral sex and digital penetration with Ms. Prasnikar.

4. All of this together, caused Mr. Veerkamp to begin engaging in acts of sexual intercourse and anal penetration with Ms. Prasnikar from 1996.

5. These acts resulted in the damages that Ms. Prasnikar seeks in this action.

On its face, there is nothing novel about the idea of holding someone liable for all the damages that arise from a chain reaction of events that their initial negligent act caused. This is the principle of proximate cause, and volumes upon volumes have been written about it. The problem with Ms. Prasnikar's *respondeat superior* claim is that her chain of causation between Mr. Veerkamp's initial actions cultivating a relationship of trust, and her damages, requires several links in the chain that 1857 Oregon *respondeat superior* doctrine does not allow. As explained above, in 1857 the Congregation could not be held liable for the actions of its employee taken outside the scope of his employment, and taken solely to gratify his own passions. *French*, 13 Or. at 425. In this context that means that the Congregation cannot be held liable for 2–4 in the chain of events above. The only way, however, to get from the actions undertaken within the scope of Mr. Veerkamp's employment and Ms. Prasnikar's damages is to say that the Congregation is liable for 2–4. Therefore, Ms. Prasnikar's *respondeat superior* theory would have failed in 1857 because it requires holding the Congregation liable for the actions of its employee that the law in 1857 said it could not be held liable for. In other words, Ms. Prasnikar asks the court to do indirectly what the law in 1857 would not have allowed to be done directly. Because Ms. Prasnikar's claim fails as a matter of law, the amount of her damages would not have been decided by a jury in 1857. Therefore, the

application of ORS 31.710 in this action does not violate her state constitutional right to a jury trial.

**CONCLUSION**

Upon review, I ADOPT in part and MODIFY in part the F&R [82]. Defendants' Motion for Summary Judgment [45] is GRANTED, and therefore all claims against the ELCA and the Synod are dismissed. Defendant the Congregation's Motion for Summary Judgment [49] is GRANTED as to Ms. Prasnikar's negligence claim, prayer for punitive damages, and prayer for noneconomic damages.

IT IS SO ORDERED.

DATED this __7th__ day of January, 2015.

/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Judge